IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86129-8-I |
| Respondent, | |
| v. | DIVISION ONE |
| LEE H. ROUSSO, | UNPUBLISHED OPINION |
| Appellant. | |

CHUNG, J. — Lee Rousso was convicted of two counts of felony stalking and one count of assault in the second degree. Rousso claims insufficient evidence supported his felony stalking convictions and asserts sentencing errors. We disagree and affirm.

FACTS

In 2012, Lee Rousso represented Jacob Stone in a criminal matter (the Stone case), wherein Stone was convicted by a jury of a drive-by shooting and attempting to elude police officers. Stone hired attorney Neil Fox to pursue post-conviction relief. Fox filed a CrR 7.4 motion for a new trial on Stone's behalf, claiming that Rousso's failure to obtain integral impeachment evidence about an officer involved in Stone's case constituted ineffective assistance of counsel. At an evidentiary hearing, Fox examined Rousso, asking him questions about documents that Rousso alleged he had never read. Subsequently, attorney Lenell Nussbaum signed a declaration as an expert witness opining that Rousso's representation of Stone "fell below the standard of practice for a reasonable criminal defense lawyer." The trial court concluded that

Rousso provided ineffective assistance of counsel to Stone, vacated the drive-by shooting conviction and ordered a new trial. Thereafter, Stone and the State reached an agreement pursuant to which the State dismissed the drive-by shooting charge.

In 2015, Stone filed a civil legal malpractice suit against Rousso, and a jury found in favor of Rousso. According to Rousso, as a result of the Stone case, he closed his practice and began working for other lawyers and was "in pretty bad shape mentally."

Rousso then filed a civil action against Fox for defamation and sanctions and later amended his complaint to add Nussbaum as a defendant. The court dismissed Rousso's claims against Nussbaum in 2017 and dismissed Rousso's claims against Fox in 2018. The court also imposed sanctions on Rousso for bringing frivolous and improper claims. Fox reported that after the conclusion of the litigation, he "circulated Mr. Rousso's photo within my office for security purposes."

In 2021, Rousso published an autobiography titled *Not Lucky*,[1] which he began writing with the intent of telling his story about the Stone case and subsequent related litigation. Rousso's book expressed anger against Fox and Nussbaum. For example, one excerpt states, "In my nightmares, I have smashed Neil Fox's skull with a steel pipe pi[ñ]ata style. In my nightmares, I have sliced Neil Fox to shreds with a long hunting knife," and "[i]n my dreams, I have done horrible things to Lenell Nussbaum's face with broken glass, battery acid, and razor blades." At Rousso's trial, Fox and Nussbaum testified that they both learned of Rousso's book at the time of its publication in 2021, but did not read it at that time.

---

[1] The full name of the book is *Not Lucky: The Lee Rousso Story: The Incredible True Story of a Legendary Gambler's Losing Battle with a Crooked Judge*.

2

In February 2022, Rousso and his then-wife moved to Taiwan. Rousso testified that he lived in Taiwan for eight months, but that he "could not quite let go of the things that had been destroying [his] life for the last decade." In October 2022, Rousso divorced his wife and moved back to Seattle. He testified that in doing so, "in the not too distant future, [he] would, in some way, confront Neil Fox," and that he "wanted [his] day in court."

Rousso explained that after returning to Washington, he went to a sporting goods store looking for a "knife that was small enough so that [he] could use it without inflicting a serious injury," because he had already decided that he "did not want to kill anyone." He ultimately purchased "a Smith & Wesson border guard knife." Rousso testified that after returning to Seattle he was sleeping in his car and began to "check[] on Neil Fox" to ensure that Fox still lived at the address he had for him. Further, he stated that he "didn't want to be in a situation where [Fox] had moved and there was someone else living there and [Rousso] would stab the wrong person because that would be a horrible turn of events."

Rousso testified that he had been in Fox's neighborhood the morning of December 13, 2022, but that Fox did not appear to be home, so he left. He testified that "by that point in time (December 13), [he] kind of knew the cars in the neighborhood" and "knew that Neil Fox would be driving an old Subaru." Rousso returned to Fox's house around 3:45 p.m. and waited until he saw a Subaru pull up to Fox's house around 6:50 p.m. According to Rousso, he then got out of his car, "walked up behind [Fox]," aimed for "the shoulder blade because, in [his] opinion, that would be the part of his body that would be the least likely to cause serious injury," and stabbed Fox with the

3

knife. Rousso testified that he walked away and saw that Fox was still standing and that Fox yelled at him, " ' Who are you?' " to which Rousso responded, " 'Who are you?' " Rousso testified that by this question, he meant "[w]ho are you to lie about me? Who are you to cheat me out of my career? Who are you to destroy my life?"

At Rousso's trial, Fox testified to his version of events. Fox testified that he "felt someone approaching [him] from behind . . . [and] felt this punch right in the center of [his] back." He explained that initially he did not know what happened but then he felt "something dripping down [his] back" and realized he had been stabbed. Fox asked his neighbor to call the police, which she did. Seattle Police Department (SPD) and paramedics responded to the scene, and Fox was subsequently transported to Harborview Hospital. Fox "had a laceration to his back and underneath his right shoulder blade" and received four stiches in his back, but there was no damage to his internal organs.

After hearing about Fox being stabbed, Nussbaum called SPD to report that a man in a blue car had been in front of her house in the preceding days. At trial, Nussbaum testified that on December 7, she had noticed a blue car sitting in front of her house with a man sitting inside smoking and became concerned that it was Rousso. Nussbaum noted that the man in the blue car was not leaving, so she locked her doors while at home—a behavior not typical for her.

Detective Sarah Mulloy began investigating Fox's case. Fox, Nussbaum, and their neighbors provided a license plate number to SPD and stated that Fox's assailant had left in a blue car. SPD ran the license plate and learned the blue car was owned by Rousso. SPD obtained a warrant to access Rousso's cell phone and internet search

history from November 8 through December 13, which revealed that Rousso had been looking up addresses of people who participated in the various cases associated with the Stone case. SPD also tracked Rousso's whereabouts in the weeks leading up to the stabbing, placing Rousso in front of Nussbaum's home on December 7 and 8, and in front of Fox's home on December 9 through 13, including at the time of the stabbing. In January 2023, SPD tracked Rousso to California and subsequently issued a warrant for his arrest and transport back to Washington.

Subsequently, Rousso was charged with three counts: count 1, assault in the first degree for stabbing Fox; count 2, felony stalking of Fox; and count 3, felony stalking of Nussbaum. Before trial began, the State sought to admit quotations from Rousso's book *Not Lucky* under ER 404(b) to prove Rousso's motive and intent. The trial court admitted several quotations and excluded other excerpts as unfairly prejudicial.

At trial, Rousso represented himself with assistance from standby counsel.[2] On count 1 for the assault of Fox, the jury found Rousso guilty of the lesser-included crime of assault in the second degree. The jury also found Rousso guilty of counts 2 and 3 for the felony stalking of Nussbaum and Fox. Further, as to count 1 and count 2, the jury found by special verdict the aggravating circumstances that Rousso used a deadly weapon to commit the crimes and that he committed the crimes "against an officer of the court in retaliation of the officer's performance of his or her duty to the criminal justice system."

In Rousso's sentencing memorandum, he sought a sentence of 37 months, followed by 18 months of community custody. He reasoned that an aggravated

---

[2] Attorney Craig Suffian assisted Rousso in his defense at trial, including filing motions on Rousso's behalf, and conducting direct examination of Rousso and his former spouse.

exceptional sentence was unwarranted, and "[a]s convicted and without any additional aggravating factors, [the] standard range is 37 to 41 months: 25 to 29 months on Count 2 including the deadly weapon enhancement plus 12 months for the deadly weapon enhancement as to count 1 with count 3 running concurrently." (Emphasis omitted.) The State recommended an exceptional sentence of 120 months each for counts 1 and 2 and 17 months for count 3, all to run consecutively for a total of 257 months.

The sentencing court imposed exceptional sentences for counts 1 and 2, 108 months and 70 months, respectively, each with a 12-month mandatory deadly weapon enhancement, and a standard range sentence of 17 months for count 3, to be served concurrently with count 2, for a total of 202 months of confinement. The sentencing court's findings of fact and conclusions of law in support of the exceptional sentence noted the jury had found two aggravating factors—use of a deadly weapon and retaliation for performance of duty in the criminal justice system. It also found Rousso "remain[ed] a danger to Mr. Fox and Ms. Nussbaum and others in the criminal justice system against whom he has expressed anger and abhorrence." As such, it concluded that there was a "substantial and compelling reason justifying an exceptional sentence above the standard range on counts 1 and 2." Rousso timely appeals.

DISCUSSION

On appeal, Rousso challenges the sufficiency of evidence supporting his stalking convictions. He also challenges the basis supporting his exceptional sentences as improper and his sentence as excessive.

I. Sufficiency of the Evidence

In a criminal trial, the prosecution must prove each element of a crime beyond a reasonable doubt. State v. Mitchell, 169 Wn.2d 437, 442, 237 P.3d 282 (2010) (citing In re Winship, 397 U.S. 358, 364 (1970)). When a criminal conviction is entered absent sufficient evidence, it violates due process. Winship, 397 U.S. at 364. Thus, when a defendant challenges the sufficiency of evidence, we "examine[] the record to determine whether any rational finder of fact could have found that the State proved each element beyond a reasonable doubt." Washington v. Farnsworth, 185 Wn.2d 768, 775, 374 P.3d 1152 (2016). However, a criminal defendant who "challenge[s] the sufficiency of the evidence, admits the truth of all of the State's evidence," and the reviewing court views "the evidence in the light most favorable to the State, drawing reasonable inferences in the State's favor." Id. at 775. We defer to the trier of fact regarding " 'issues of conflicting testimony, credibility of witnesses, and the persuasiveness of evidence.' " State v. Andy, 182 Wn.2d 294, 303, 340 P.3d 840 (2014) (quoting State v. Thomas, 150 Wn.2d 821, 874, 83 P.3d 970 (2004)).

Stalking is an alternative means crime. State v. Whittaker, 192 Wn. App. 395, 402, 367 P.3d 1092 (2016). "When a defendant challenges the sufficiency of the evidence in an alternative means case, appellate review focuses on whether 'sufficient evidence supports each alternative means' " that is presented to the jury. State v. Sweany, 174 Wn.2d 909, 914, 281 P.3d 305 (2012) (quoting State v. Kintz, 169 Wn.2d 537, 552, 238 P.3d 470 (2010)).

The stalking statute requires proof of the following:

> (a) A person commits the crime of stalking, if without lawful authority the person:

7

> (i) Intentionally and repeatedly harasses another person; [or]
> (ii) Intentionally and repeatedly follows another person;
> . . . and
> (b) The person being harassed, followed, tracked, or monitored suffers substantial emotional distress or is placed in fear that the stalker intends to injure him or her, or another person, or his or her property or the property of another person, or, in the circumstances identified in (a)(iv) of this subsection, the victim's knowledge of the tracking device would reasonably elicit substantial emotional distress or fear. The feeling of substantial emotional distress or fear must be one that a reasonable person in the same situation would experience given the totality of the circumstances.

RCW 9A.46.110(1). RCW 9A.46.110(5)(b) elevates the crime of stalking from a gross misdemeanor to a class B felony if, as pertinent here,

> (iv) The stalker was armed with a deadly weapon, as defined in RCW 9.94A.825, while stalking the victim;
> (v)(A) The victim is or was a law enforcement officer; judge; juror; attorney; victim advocate; legislator; community corrections' officer; an employee, contract staff person, or volunteer of a correctional agency; court employee, court clerk, or courthouse facilitator; or an employee of the child protective, child welfare, or adult protective services division within the department of social and health services; and
> (B) The stalker stalked the victim to retaliate against the victim for an act the victim performed during the course of official duties or to influence the victim's performance of official duties . . . .

Rousso was charged as to both Fox and Nussbaum with felony stalking under both the "follows" means and the "harasses" means.[3] On appeal, Rousso argues that there is insufficient evidence to support his conviction based on either means or to elevate the crime to a felony.

---

[3] The "to convict" jury instructions for the charge of stalking Fox stated that the State had to prove (1) that the defendant intentionally and repeatedly harassed or followed Fox; (2) that Fox was placed in fear that Rousso intended to injure him or another; (3) that Fox felt fear that a reasonable person in the same situation would experience under the circumstances; (4) that Rousso either (a) intended to frighten, intimidate or harass Fox or (b) knew or should have known that Fox was afraid, intimidated, or harassed even if he did not intend such reaction; and (5) that Rousso acted without lawful authority. The jury was similarly instructed for count 3, felony stalking of Nussbaum, as to both alternative means of harassing and following.

8

A. Proof of Alternative Means of Following

Rousso argues that the State failed to prove that he followed Fox or Nussbaum because his actions were not "in order to have contact" and did not result in visual contact with either Fox or Nussbaum—i.e., they did not observe him. Rousso also argues insufficiency of the evidence because he did not cause Fox and Nussbaum contemporaneous fear and "there was no pattern of contact." The State argues that such proof is not required to establish the "follows" alternative means and there was sufficient evidence to support the convictions. We agree with the State.

The purpose of statutory interpretation is to ascertain and give meaning to the intent of the legislature. State v. Dennis, 191 Wn.2d 169, 172, 421 P.3d 944 (2018). Criminal statutes are interpreted literally and strictly. Id. On appeal, we "derive the legislative intent of a statute solely from the plain language by considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole." Id. at 172-73. If the plain language is ambiguous then we may look to statutory construction, legislative history and case law. Id. at 173. However, courts may not add words into a statute. State v. Chester, 133 Wn.2d 15, 21, 940 P.2d 1374 (1997).

A person "follows" when they "deliberately maintain[] visual or physical proximity to a specific person over a period of time," including by "repeatedly and deliberately appear[ing] at the person's home, school, place of employment, business, or any other location to maintain visual or physical proximity to the person." RCW 9A.46.110(6)(f). For the purposes of the stalking statute, "repeatedly" means two or more separate occasions. RCW 9A.46.110(6)(i).

Rousso claims that under State v. Lee, 82 Wn. App. 298, 306, 917 P.2d 159 (1996), aff'd, 135 Wn.2d 369, 389 (1998), to avoid criminalizing otherwise legal behavior, the statute requires "intent to have contact." In Lee, the version of the stalking statute in effect[4] did not define "follows," and the Court of Appeals held that conduct constituted "following" when the person "deliberately and repeatedly correlates [their] movements or appearances with another person's in order to have contact with the person." 82 Wn. App. at 306. However, subsequent to the defendants' conduct at issue in Lee, the legislature defined "follows" and expressly did not include "in order to have contact" in its definition. See LAWS OF 1994, ch. 271, § 801 (adding definition of "follows" to RCW 9A.46.110(6)). The statutory definition of "follows" has remained unchanged since its enactment. See RCW 9A.46.110(6)(f).

Rousso's reliance on the Supreme Court decision in Lee is also unavailing. He claims the companion cases in addressed in Lee, involving defendants Lee and Yates, are examples where "there was repeated contact after the defendant was told not to have contact with the victim" and that together, these cases require intent to have contact, such as a warning followed by actual contact.[5] But the Supreme Court decision addressed a constitutional challenge to the stalking statute and concluded that the statute was not overbroad because it did not intrude on constitutionally protected behavior. Lee, 135 Wn.2d at 389-92. The Supreme Court did not address, much less

---

[4] The defendants' charged conduct took place in 1993. Lee, 135 Wn.2d at 373-78.

[5] As for a prior warning not to contact, it is true that for *one* of the three alternative means, RCW 9A.46.110(1)(a)(iii), stalking occurs when that person "[i]ntentionally contacts, follows, tracks or monitors, or attempts to contact, follow, track or monitor another person *after being given actual notice* that the person does not want to be contacted, followed, tracked, or monitored." (Emphasis added.) But Rousso was not charged under subsection (iii). He was charged under subsections .110(1)(a)(i) and (ii), the "harasses" and "follows" means, neither of which includes language similar to subsection .110(1)(a)(iii) requiring prior actual notice.

support, Rousso's contention that the State must prove the defendant intended to have contact with the victim and that the alleged "following" cannot be unobserved.

Rousso further argues that "fear [must be] based on actual contact and actions designed to cause fear, not being located near a person where that person did not notice." But the cases on which Rousso relies do not support that proposition. In State v. Ainslie, we held there was sufficient evidence to support a conviction for stalking by following where the defendant regularly parked in front of a 14-year-old victim's mailboxes, got out of his car as she walked nearby, and was seen in the girl's yard. 103 Wn. App. 1, 6, 11 P.3d 318 (2000). The evidence that the victim was alone, saw the defendant get out of his car, and persisted in parking there despite her father's warnings to him was sufficient evidence of her reasonable fear. Id. Further, the court concluded that the evidence that the defendant had been informed by a police officer that his conduct had caused the girl concern and that her father told him to stop was sufficient to show that the defendant knew or should have known his conduct was frightening. Id. at 7. Rousso argues that because the victim saw the defendant, the court required proof of contact. But the Ainslie court did not so hold. Instead, the court noted that the statute defines "following" as "deliberately maintaining visual or physical *proximity to* a specific person over a period of time," not contact or awareness by the victim. See id. at 5 n.1 (citing RCW 9A.46.110[6]) (emphasis added). Similarly, in State v. Kintz, while the court noted that the victim saw the defendant, its determination that the defendant "followed" the victim on six separate occasions was based on the fact that the defendant

---

[6] The current statute, RCW 9A.46.110(6)(f), contains the same language defining "following" that is quoted in Ainslie, former RCW 9A.46.110(1)(a) (LAWS OF 1999, ch. 143, § 35), and that applied to Rousso, former RCW 9A.46.110(6)(c) (2021). Thus, we cite to the current statute for the definition.

"deliberately maintain[ed] visual and physical proximity" by driving by and past the victim and her children in a van. 169 Wn.2d 537, 555-56, 238 P.3d 470 (2010) (citing RCW 9A.46.110(6)(b)[7]). And in State v. Whittaker, the court did not suggest actual contact was required when it found sufficient evidence for stalking by following; there, the defendant appeared at the victim's place of work while she was there in violation of a protection order. 192 Wn. App. at 405. Thus, contrary to Rousso's suggestion, the State was not required to prove the victim made visual contact with the defendant to convict Rousso of stalking by following.[8]

Nor did the State have to prove that his actions caused contemporaneous fear, as Rousso contends. Rousso claims insufficiency of the evidence because Fox and Nussbaum did not feel fear until after Rousso stabbed Fox. Rousso argues that "[t]he person 'being' followed 'suffers' emotional distress or 'is placed in fear,' " so the word "being" suggests the fear must be contemporaneous with the action of "following." Rousso also contends that the use of the present tense in the stalking statute indicates that it contemplates contemporaneous fear. We are not convinced.

The statute defines the first means for stalking as when a person "[i]ntentionally and repeatedly follows another person." RCW 9A.46.110(1)(a)(ii). As the State notes, the plain language of the statute does not include a temporal or immediacy element. The provision to which Rousso refers requires that "[t]he person being harassed, followed, tracked, or monitored suffers substantial emotional distress or is placed in fear

---

[7] In Kintz, the relevant statutory language defining "following," former RCW 9A.46.110(6)(b) (2007), was also the same as that in the current RCW 9A.46.110(6)(f).

[8] Because we conclude that the State did not need to prove "contact," we need not consider Rousso's argument that he did not intend or have contact with Fox or Nussbaum, unlike in Lee, 135 Wn.2d at 373-78, where the defendants intended and had significant contact with the named victims.

that the stalker intends to injure [them] or another person, or [their] property." RCW 9A.45.110(1)(b). This statutory provision focuses on the effect of the defendant's acts on the person, i.e., that the person suffers substantial emotional distress or is placed in fear, without temporal qualification.

This language in the stalking statute is similar to that in the harassment statute, which requires that "words or conduct places the person threatened in reasonable fear." RCW 9A.46.020. Neither statute requires that the victim be placed in fear at the same time as the charged acts. For example, our Supreme Court has held that under the harassment statute, a victim can be placed in reasonable fear of threatening conduct even when they learn of the conduct after the fact. State v. J.M., 144 Wn.2d 472, 482, 28 P.3d 720 (2001). We have also held a victim's fear based in part on non-contemporaneous, prior experiences can satisfy the reasonable fear requirement. In State v. Nguyen, the defendant challenged his stalking conviction, primarily as facially overbroad, and we affirmed. 10 Wn. App. 2d 797, 450 P.3d 630 (2019). After rejecting the overbreadth challenge, we concluded there was sufficient evidence to support the conviction. Id. at 811. We held that the former girlfriend's "fear was objectively reasonable" based on her "past experiences with [the defendant]," including "several incidents of physical assaults and breaking down her front door twice," "repeated and unwanted calls and text messages, and visits to [the victim's] house." Id. at 814. Similarly, here, we conclude that the felony stalking statute does not require proof of contemporaneous fear.

1. Sufficiency of Evidence of Following Fox

Rousso's cell phone data demonstrated that he had been in front of Fox's home on several consecutive days. Rousso himself testified that he was in front of Fox's home "pretty much every day" starting on December 6 through December 13, establishing that his conduct was repeated. Rousso further testified that the purpose of his visits to Fox's home was to "make sure he still lived there," because he "didn't want to be in a situation where [Fox] had moved and there was someone else living there and [he] would stab the wrong person." This is sufficient evidence to demonstrate that Rousso sought to deliberately maintain visual proximity to Fox.[9]

Further, Fox testified that immediately after he was stabbed, he suspected—but was not certain—that Rousso was his attacker. Fox was "very concerned" that he would be killed "if [his attacker] came across [him] in the days following the stabbing." Based on these concerns, Fox stopped riding his bike for "fear of being run-down," installed a home security system, and kept a baseball bat by the door. Fox also testified that after learning that Rousso had used his cell phone to track him, Fox had "increased fear about [his] security and the security of [his] family" because he was uncertain whether someone was still following him. This is sufficient evidence that Fox was afraid of being injured and that a reasonable person would have similarly experienced fear. Finally, although Fox did not know of Rousso's conduct in following him until after he was stabbed, Rousso knew or should have known that his actions of repeatedly visiting

---

[9] When asked at trial whether he went to Fox's house to "make visual contact with [Fox]," Rousso responded "yes." Rousso argues that because "visual contact" requires Fox seeing Rousso (rather than Rousso seeing Fox), the State misused the term "visual contact" in its questioning of him. As discussed above, the victim need not have visual contact of the defendant; thus, we reject this argument.

Fox's home with the intent to assault Fox would have frightened Fox.[10] Thus, we conclude that, accepting the State's evidence as true, any rational finder of fact could have found that Rousso intentionally and repeatedly followed Fox in violation of the stalking statute, that Fox was fearful, and that his fear was reasonable considering the circumstances.

### 2. Sufficiency of Evidence of Following Nussbaum

Regarding the count of felony stalking of Nussbaum through following, Rousso makes the same arguments as for the count involving Fox—that his second visit to Nussbaum's house was unobserved and thus could not have caused Nussbaum fear and that the State failed to prove that he followed her "in order to make contact" with her. We reject these arguments because, as discussed above, the statute requires neither contemporaneous fear nor proof that the following was "in order to make contact."

Rousso testified that he looked up Nussbaum's address and went to her house on December 7 and 8 because he "had never seen her before," and "wanted to know what this person looked like." Nussbaum testified that she "saw a blue car [parked across the street] with a gentleman sitting in it, smoking from a glass pipe," and that it was parked there for an unusual amount of time. Any rational finder of fact could have found from this evidence that Rousso "repeatedly followed" Nussbaum.

---

[10] The version of the statute applicable to Rousso contained the requirement that the defendant either "[i]ntends to frighten, intimidate, or harass the person" or "knows or reasonably should know that the person is afraid, intimidated, or harassed even if the stalker did not intend to place the person in fear or intimidate or harass the person," former RCW 9A.46.110(1)(c)(i), (ii) (2021), as reflected in the jury instructions. The legislature removed this language in 2023, but this change did not go into effect until July 23, 2023, after Rousso's trial. See RCW 9A.46.110(6)(f) (LAWS of 2023, ch. 461, § 1).

Rousso testified that he watched Nussbaum and her husband go for a walk and acknowledged that Nussbaum saw him on December 7. Yet Rousso argues that "Nussbaum's 'concern' on seeing the car on December 7 was insufficient to demonstrate fear." But Nussbaum testified that she "was on heightened alert" after the December 7 incident because she was "afraid that it was Lee Rousso" in the car. She testified that after seeing the blue car outside, she locked her doors while home, which she typically did not do. Subsequently, when Nussbaum learned that Fox had been stabbed, she took a knife to her bedroom to protect herself, purchased pepper spray, and installed a security system and cameras. Based on this evidence, we conclude that any rational finder of fact could have found that Nussbaum was fearful and that her fear was reasonable considering the circumstances, and that Rousso knew or should have known his actions would have frightened Nussbaum.

B. Proof of Alternative Means of Harassing

Under the stalking statute, a person "harasses" when they engage in a "knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, torments, or is detrimental to such person, and which serves no legitimate or lawful purpose." RCW 9A.46.110(6)(g).[11] Several Washington courts have addressed what constitutes a course of conduct that causes emotional distress for purposes of the "harasses" alternative means under the stalking statute. For example, in State v. Whittaker, the court concluded there was sufficient evidence that the defendant harassed the victim where he went to the victim's house while intoxicated and "banged on the door," entered her home through her window, and then later approached the

---

[11] We cite to the current version of the statute, which contains the same definition of "harasses" as in the version of the statute that applied to Rousso, former RCW 9A.46.110(6)(d) (2021).

16

victim's car and "grabbed her arm and stated that he wanted to talk to her." 192 Wn.2d at 407. Further, evidence that the victim installed security cameras, ended various relationships, and hid for a period of time upon hearing of the defendant's release was sufficient to support that the victim was emotionally distressed due to the defendant's conduct. Id. at 407-08. Similarly, in Kintz, although each episode of the defendant's conduct occurred on one day, the court held that the defendant's actions in driving by the second victim several times on that day "represent[s] courses of conduct directed at a specific person, [the second victim,] which seriously alarmed her, served no lawful purpose, are such as would cause a reasonable person to suffer substantial emotional distress, and actually caused substantial emotional distress." 169 Wn.2d at 555-57.

Here, Rousso challenges the sufficiency of evidence of the "harasses" alternative means in part based on the "true threats" doctrine. He contends that the State failed to show " 'a pattern of harassment designed to coerce, intimidate, or humiliate the victim" during the charging period, citing RCW 9A.46.010, and that his book could not be considered part of a "pattern of harassment" unless it was a true threat for which he could have been separately prosecuted. Rousso also contends that the State was barred from using his book as the basis for the "harasses" alternative means for stalking because it was published outside of the charging period. We reject these arguments.[12]

First, Rousso was not charged with the crime of harassment under RCW 9A.46.020; he was charged with the "harasses" alternative means of stalking under

---

[12] Rousso also argues that the State elected to argue under the "follows" provision and "disavowed harassment as a means to commit stalking," and, thus, proof of harassment cannot now support his conviction. In support of his argument, Rousso points to his own cross-examination where he acknowledged that a person who commits felony or misdemeanor harassment could be charged with a crime and receive a jury trial. However, as Rousso does not point to any other evidence in the record or any authority supporting this claim, the argument is unpersuasive.

RCW 9A.46.110(1)(a). The "harasses" alternative means of the crime of stalking does not require the State to prove a "pattern of harassment," but instead that Rousso engaged in a "knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, torments, or is detrimental to such person." See RCW 9A.46.110(6)(g).

Second, the "true threats" doctrine does not apply because Rousso's book was not the basis for the stalking charges. Under the true threats doctrine, "a statute . . . which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind." Watts v. United States, 394 U.S. 705, 707 (1969). Under the First Amendment, "true threats" are not protected speech. J.M., 144 Wn.2d at 477. For example, in State v. Kilburn, the defendant was charged with felony harassment under RCW 9A.46.020 based on his threat to kill the alleged victim. 151 Wn.2d 36, 38-39, 84 P.3d 1215 (2004). The court held that "a conviction for felony harassment based upon a threat to kill requires that the State satisfy both the First Amendment demands—by proving a true threat was made—and the statute, by proving all statutory elements of the crime." Id. at 54. In Kilburn, the State failed to show a true threat, so the court reversed the conviction, concluding it did not need to decide whether the statutory elements were otherwise satisfied. Id.

Unlike the defendant in Kilburn, Rousso was not charged based on a threat, either spoken or written. While the court admitted excerpts and quotes from Rousso's book into evidence, they were not the basis for the stalking charges. Rather, the charges in the information were based on Rousso's conduct in December 2022.[13] The

---

[13] At trial, Detective Mulloy testified that she read Rousso's book to ascertain his motive and intent.

State used Rousso's book to establish his motive and intent in committing the charged crimes[14] as well as to establish the reasonableness of Fox's and Nussbaum's fear.[15] The true threats doctrine does not apply to the stalking charges in this case.[16]

       1.  <u>Sufficiency of Evidence of Harassing Fox</u>

Rousso testified to his course of conduct in preparing for the assault by admitting to his presence outside of Fox's home every day between December 6 and December 13. Rousso claims this was not unlawful because it is not unlawful to park on the street. But as the State points out, the ultimate question is whether the course of conduct was unlawful.

Fox testified that immediately after he was stabbed, he suspected but was not certain that Rousso was his attacker and was "very concerned" that he would be killed "if [his attacker] came across [him] in the days following the stabbing," so much so that he stopped riding his bike for "fear of being run-down," installed a home security system, and kept a bat by the door. Even before Fox was stabbed, after the lawsuit

---

[14] The State began its closing by explaining Rousso's building antipathy toward Fox and Nussbaum: "The pot had initially been set on the stove" at a March 2013 meeting with Fox, and "[t]he heat was turned up" with Nussbaum's declaration. The State then mentioned the book: "[T]he pot was simmering for all to see of the publishing of Mr. Rousso's book. All of his rage printed for everyone to see for a reaction that didn't come."

[15] The State described the book's role in Fox's reaction to the charged acts from December 2022: "[Fox's] fear grew shortly after the attack as he realized that Mr. Rousso was the likely attacker . . . . And then his fear grew as he learned more about what was written in the book." Similarly, as to Nussbaum, the State argued, "Let's talk about her fear. She was aware of the book. She was aware of the rage of Lee Rousso . . . . Shortly after that strange car appeared, after a long period of never having to deal with Lee Rousso, her first thought, her first fear was that it was Lee Rousso . . . . That fear increased, if you can believe that, increased, after she read the quotes, read the words of Mr. Rousso in the ensuing days and then increased even more when she found out that he had been to her house again." The State also argued the book was evidence that Rousso knew or should have known the victims would be afraid after his December 2022 acts based on his previous writings.

[16] Rousso argues that the book excerpts and quotes were not "true threats" because, even if "inflammatory," they were "fantasies" and expressed only a "desire to harm," not an intent to harm. Because we conclude that the true threats doctrine is not implicated, we need not consider this argument. We also do not address his claim that pursuant to <u>Counterman v. Colorado</u>, 600 U.S. 66 (2023), he could be convicted of stalking only if the State proved that he acted with reckless disregard that Fox would find the statements threatening.

against him and Nussbaum, Fox was sufficiently concerned about Rousso's behavior that he and Nussbaum circulated a photo to their staff in case Rousso showed up at their office. Also, Fox was aware of Rousso's book at the time of its publication in 2021. Though he did not read it at that time, after Fox was stabbed, the police informed him of specific statements from Rousso's book expressing violent thoughts about him,[17] including that "[i]n my nightmares I have smashed Neil Fox's skull with a steel pipe, pi[ñ]ata style. In my nightmares I have sliced Neil Fox to shreds with a long hunting knife. And in my nightmares, I have strangled Neil Fox with barbed wire." Rousso's actions toward Fox would cause a reasonable person to suffer substantial emotional distress and actually did cause Fox substantial emotional distress. Based on this evidence, any rational finder of fact could have found that Rousso's course of conduct was sufficient to support Rousso's stalking conviction under the "harasses" alternative means.

Rousso further challenges the evidence of the "harasses" alternative means for stalking, because, he claims, his assault charge was impermissibly used as the basis, citing to State v. Vladovic, 99 Wn.2d 413, 420-21, 662 P.2d 853 (1983). Vladovic, however, involved the issue of merger where the defendant was charged with attempted robbery in the first degree, robbery in the first degree, and four counts of kidnapping in the first degree arising from a single incident on the University of Washington campus. 99 Wn.2d at 420-22. The reviewing court held merger could occur if the robbery was

---

[17] Rousso raises a concern that Fox learned of the book excerpts from law enforcement. However, as discussed above, the victim's fear may be based on information that is not contemporaneous with the charged conduct. Further, as also discussed above, the excerpts were not the basis for the charges, but rather, offered only as evidence of Rousso's motive and intent and the reasonableness of Fox's and Nussbaum's fear.

incidental to the kidnapping, but explained that there, the crimes "clearly created separate and distinct injuries," particularly because they involved different people, so kidnapping did not merge into robbery in the first degree and, inversely, robbery did not merge into kidnapping in the first degree. 99 Wn.2d at 420-22. The merger doctrine does not apply here because the evidence supporting the assault charge and stalking charge are distinct. Although the charge of stalking Fox was elevated to a felony because the jury found that Rousso was armed with a deadly weapon, the other evidence of harassment, described above, was distinct from the evidence of assault— that Rousso stabbed Fox.

### 2. Sufficiency of Evidence of Harassing Nussbaum

We likewise conclude there is sufficient evidence that Rousso's conduct toward Nussbaum satisfied the "harasses" alternative means under RCW 9A.46.110(6)(g).

Rousso twice went to Nussbaum's house. On December 7, Rousso watched Nussbaum and her husband go for a walk. Although Rousso testified that he did not intend to assault Nussbaum, he admitted that while he was parked outside Nussbaum's home, he had his knife with him. Further, Nussbaum testified that after seeing the blue car outside she locked her doors while home, which she typically did not do. And subsequently, when Nussbaum learned that Fox had been stabbed, she took a knife to her bedroom to protect herself, purchased pepper spray, and installed a security system and cameras, which supports that Rousso's actions did cause Nussbaum fear and alarm. This evidence alone is enough to support that Rousso engaged in a course of conduct "which seriously alarms, annoys, torments, or is detrimental to such person, and which serves no legitimate or lawful purpose." RCW 9A.46.110(6)(g).

Here, in addition, the record also includes evidence that Rousso's conduct would reasonably alarm Nussbaum when considering Rousso's course of conduct as a whole. After Rousso's lawsuit against Fox and Nussbaum, they had circulated a photo to their staff because they were concerned that Rousso might show up at their office. Also, Nussbaum was aware of Rousso's book at the time of its publication in 2021, though she did not read it at the time. Then, after Fox was stabbed, Nussbaum learned from the police about specific excerpts expressing Rousso's desire to harm her, such as, "[i]n my dreams I have done horrible things to Lenell Nussbaum's face with broken glass, battery acids, and razor blades," and "[e]ven now, years later, I cannot think about any member of The Bar Card Lynch Mob for more than a few seconds before my thoughts turn extremely violent." A reasonable person knowing of Rousso's intent to exact revenge despite the passage of many years, as well as of his assault of Fox, would suffer substantial emotional distress, and the evidence established that Nussbaum actually did suffer substantial emotional distress.

We conclude that based on this evidence, accepted as true and viewed in the light most favorable to the State, any rational finder of fact could have found that Rousso knowingly engaged in a course of conduct that caused Nussbaum fear sufficient to convict Rousso of the "harasses" alternative means of stalking.

C. Proof of Elevating Circumstances

RCW 9A.46.110(5)(b) sets out several ways that the crime of stalking may be elevated from a gross misdemeanor to a class B felony, three of which are at issue here. One method is to prove the stalker was armed with a deadly weapon, as defined

22

in RCW 9.94A.825, while stalking the victim. RCW 9A.46.110(5)(b)(iv). Additionally,

stalking may also be elevated to a felony by proof of the following:

> (v)(A) The victim is or was a law enforcement officer; judge; juror;
> attorney; victim advocate; legislator; community corrections' officer; an
> employee, contract staff person, or volunteer of a correctional agency;
> court employee, court clerk, or courthouse facilitator; or an employee of
> the child protective, child welfare, or adult protective services division
> within the department of social and health services; and
> (B) The stalker stalked the victim to retaliate against the victim for an act
> the victim performed during the course of official duties or to influence the
> victim's performance of official duties . . . .

RCW 9A.46.110(5)(b). A third alternative means of elevating stalking to a felony is

through proof that "[t]he victim is a current, former, or prospective witness in an

adjudicative proceeding, and the stalker stalked the victim to retaliate against the victim

as a result of the victim's testimony or potential testimony." RCW 9A.46.110(5)(b)(vi). As

there are alternative means to elevate stalking to a felony, our review focuses on

whether sufficient evidence supports each alternative means presented to the jury.

Sweany, 174 Wn.2d at 914.

> 1. Elevating Circumstances for Stalking Fox

Rousso argues that the jury's verdict was ambiguous because it did not specify

which of the elevating factors it relied upon to convict him of felony stalking of Fox.

Rousso cites to State v. Deryke, where the court explained that the rule of lenity

requires courts to interpret ambiguous verdicts in favor of the defendant. 110 Wn. App.

815, 41 P.3d 1225 (2002).

Here, the to-convict instruction states that for the elevated crime of felony

stalking as to count 2, the jury needed to find either that Rousso was armed with a

deadly weapon or that he knew that Fox "was a current or former attorney; and that

23

[Rousso] stalked Neil Fox to retaliate for an act that Neil Fox performed during the course of his official duties."

We conclude that any rational finder of fact could have found that the State proved both of the alternative circumstances in the to-convict instructions that elevated Rousso's charges to felonies. As to the deadly weapon elevating circumstance, the State offered evidence that Rousso purchased a knife from a sporting goods store on November 8, 2022. Rousso testified that he was living out of his car at this time and that all of his belongings, including the knife remained in the car with him. Rousso himself testified that he "checked on Neil Fox" to ensure he did not "stab the wrong person" and that his goal in going to Fox's was to make visual contact with Fox and to stab him.

The State also offered evidence that that the stalking was in retaliation against an attorney performing their official duties. The State offered evidence that Fox represented Jacob Stone in his appeal asserting that Rousso's representation was ineffective. Rousso then testified that after getting the order that the court found his assistance was ineffective, he felt his legal career "was doomed" and felt that he began to lose control of his life. Rousso testified that he began "having horrible thoughts about Neil Fox" after the Stone case. Rousso testified that he thought writing his book would "be a catharsis" and "would really allow [him] to put" it all behind him. However, he testified that he returned to Seattle from Taiwan with the hope to "in some way, confront Neil Fox," and that he planned to air his grievances against Fox and Nussbaum to "hold these people accountable for lying about me." We conclude that any rational finder of fact could have found that Rousso acted in retaliation for Fox's performing his official duties in the Stone case, representing his client.

2. <u>Elevating Circumstances for Stalking Nussbaum</u>

For Nussbaum, the State charged only one alternative means for the elevating circumstance, that Rousso "knew that [Nussbaum] was a witness in an adjudicative proceeding; and that [he] stalked [Nussbaum] to retaliate against her for her testimony or potential testimony." We conclude that there is sufficient evidence to support the elevating factor that Rousso retaliated against Nussbaum for her testimony in the Stone case, as charged.

Nussbaum testified that in support of Stone's appeal, she signed an affidavit opining on the standard for a reasonable defense lawyer and Rousso's failure to meet that standard. Rousso testified that he could not believe "[t]he dishonesty of Neil Fox and Lenell Nussbaum" regarding the fallout from the Stone case, and that if he got an opportunity to confront them, he would "ask Lenell Nussbaum about why she lied about me." Rousso further testified that he went to Nussbaum's house on December 7 and 8 because he did not know what she looked like and wanted to visually identify her.

We conclude that any rational finder of fact could have found that the State proved the factor as alleged to elevate the charge of stalking Nussbaum to a felony.

II. <u>Challenges to Sentence</u>

Rousso challenges the basis for his exceptional sentence. He argues that even if the jury's special interrogatory findings may provide a basis, the trial court entered findings of fact that went beyond facts found by the jury. He also challenges his sentence as impermissibly excessive. Rousso's arguments are unavailing.

A. Basis for Exceptional Sentence

A jury must find by special interrogatory "any facts supporting aggravating circumstances beyond a reasonable doubt." State v. Stubbs, 170 Wn.2d 117, 123, 240 P.3d 143 (2010). Any evidence "regarding any facts supporting aggravating circumstances" under RCW 9.94A.535(3) must be presented to the jury during the trial. RCW 9A.94A.537(4).

Here, the State charged, and the jury found, aggravating circumstances under RCW 9.94A.535(3)(x), which requires proof of a defendant's retaliatory actions against an official working in the criminal justice system, as to both counts 1 and 2, for assault and stalking of Fox.[18] This particular aggravating factor expressly distinguishes those working in the criminal justice system from other officials and officers of the court. State v. Gipson, 191 Wn. App. 780, 786, 364 P.3d 850 (2015) (emphasizing that the Legislature clearly intended RCW 9.94A.535(3)(x) to apply to different categories of persons).

Rousso challenges the court's "findings" that he posed a risk of present and future dangerousness, that he posed a continued threat to the victims and community, and that he is at a high risk for reoffending, claiming these are facts that must be found by a jury.[19] However, as the State points out, Rousso conflates the factors that must be

---

[18] As there was no special verdict finding aggravating factors as to count 3 of felony stalking of Nussbaum, Rousso's challenge to his sentence is only as to counts 1 and 2 for assault and felony stalking of Fox.

[19] The court's order supporting the exceptional sentence identifies only one of the challenged "findings" as a finding. Finding of fact 8 states, "The court finds that Mr. Rousso, while not a danger to the public at large, remains a danger to Mr. Fox and Ms. Nussbaum and others in the criminal justice system against whom he has expressed anger and abhorrence." Other challenged "findings" are identified as conclusions. Conclusion of law 9 states, "Mr. Rousso's demonstrated lack of self-reflection and accountability also demonstrate his continuing threat to the victim and community." Conclusion of law 10 states, "Mr. Rousso's words and actions demonstrate that he remains at high risk of reoffending against

found by a jury to authorize an exceptional sentence with factors that a court may consider to determine the length of the sentence. A court may consider future dangerousness in setting the *length* of a sentence. See State v. McCune, 74 Wn. App. 395, 398, 873 P.2d 575 (1994). The cases Rousso cites in support of his challenge provide merely that future dangerousness cannot be the *basis* for an exceptional sentence if the convictions are not for sexual offenses. See State v. Halgren, 137 Wn.2d 340, 343-46, 971 P.2d 512 (1999) (in unlawful imprisonment case, holding future dangerousness could not be a basis for an exceptional sentence in nonsexual offense cases); In re Pers. Restraint of Vandervulgt, 120 Wn.2d 427, 431-33, 842 P.2d 950 (1992) (future dangerousness was an improper basis for an exceptional sentence of nonsexual offense case, such as for convictions for assault in the first degree and kidnapping in the first degree while armed with a dangerous weapon).

Here, the jury found by special verdict as to both counts 1 and 2 for Fox that Rousso's crimes were committed against an officer of the court in retaliation for the officer's performance of their duty in the criminal justice system. Thus, the jury, not the court, found the aggravating factor that supplied the basis for the trial court's authority to impose an exceptional sentence.[20]

RCW 9.94A.537(6) explicitly authorizes courts to consider the purposes of the Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW, to determine whether there are

---

the victims in the future and the exceptional sentence is necessary to protect the victims and reduce the risk of reoffending."

[20] Rousso also contends that the trial court was not authorized to find that Rousso had "increasing animosity," as it did under conclusion of law 7, because that was a fact for the jury to find pursuant to RCW 9.94A.535(3)(h)(i). Likewise, Rousso contends that a jury must make a finding that Rousso committed his crime as part of "an ongoing pattern of psychological, physical or sexual abuse of a victim . . . over a prolonged period of time." However, as explained above, the trial court did not impose the exceptional sentence on these bases, but on the aggravating factor found by the jury—that Rousso's crimes were committed in retaliation against officers of the court.

substantial and compelling reasons that justify an exceptional sentence.[21] Thus, once the jury found an aggravating factor pursuant to RCW 9.94A.535(3)(x), the trial court was authorized to impose an exceptional sentence if it found substantial and compelling reasons to do so, as it did here.

B. Excessive Sentence

Rousso additionally argues that his sentence was excessive, contrary to the prohibition in the SRA, RCW 9.94A.585(4), because even considering the deadly weapons enhancement and the aggravating factor, the sentence is disproportionate. Rousso contends that the trial court must have erroneously relied on his defamation case against Fox and Nussbaum and his book to impose such a lengthy sentence when the harm to Fox was minimal and his actions were confined to a brief period of time. We disagree.

For a sentence that is outside the standard range to be reversed, the appellant must show (1) the reasons supporting the departure are not supported by the record before the court; (2) the reasons do not justify a departure from the standard range; or (3) the sentence was clearly excessive or clearly too lenient. RCW 9.94A.585(4). See also State v. Law, 154 Wn.2d 85, 93, 110 P.3d 717 (2005) (explaining that RCW 9.94A.585(4) contains three distinct three prongs). At sentencing, the rules of evidence

---

[21] According to RCW 9.94A.010, the purpose of the SRA is to

make the criminal justice system accountable to the public by developing a system for the sentencing of felony offenders which structures, but does not eliminate, discretionary decisions affecting sentences, and to: (1) Ensure that the punishment for a criminal offense is proportionate to the seriousness of the offense and the offender's criminal history; (2) Promote respect for the law by providing punishment which is just; (3) Be commensurate with the punishment imposed on others committing similar offenses; (4) Protect the public; (5) Offer the offender an opportunity to improve himself or herself; (6) Make frugal use of the state's and local governments' resources; and (7) Reduce the risk of reoffending by offenders in the community.

do not apply. State v. Griepsma, 17 Wn. App. 2d 606, 619, 490 P.3d 239 (2021); ER 1101(c)(3).

Under the first prong, when the jury, rather than the court, finds an aggravating circumstance, the reviewing court must determine whether the record substantially supports the jury's special verdict. State v. Hale, 146 Wn. App. 299, 307, 189 P.3d 829 (2008); see also Stubbs, 170 Wn.2d at 123 (holding that a jury's special interrogatory finding is reviewed for sufficiency of the evidence). Here, we conclude the jury's special verdict that Rousso retaliated against an official working in the criminal justice system under RCW 9.94A.535(3) was supported by substantial evidence. Fox testified that he was hired by Stone to appeal Stone's criminal conviction and that his theory of the case was that Stone's previous counsel, Rousso, was ineffective. Rousso testified that Fox contacted him and informed him that he would be handling Stone's appeal and was aware that Fox was filing various motions. Subsequently, Rousso filed a defamation case against Fox and Stone, alleging that Fox "lied about the quality of any work in the Jacob Stone case." Fox also testified that he filed a motion for a new trial in Stone's case pursuant to CrR 7.4 and 7.5, including the ineffective assistance of counsel claim, which the trial court subsequently granted. Rousso testified that after the Stone case, he wanted to "hold those people accountable for lying about [him]," and wanted to "get Neil Fox into court on the witness stand," so he returned to Seattle "looking for truth and justice." The jury's special verdict is supported by sufficient evidence that Rousso retaliated against Fox—a criminal defense attorney—who represented Rousso's former client.

29

As to the second <u>Law</u> prong, the legal adequacy of the reasons justifying a departure from the standard range, a departure from a standard range sentence is justified as a matter of law when (1) the trial court did not base the exceptional sentence on "factors necessarily considered by the Legislature in establishing the standard sentence range" and (2) the aggravating factor is "sufficiently substantial and compelling to distinguish the charged offense from others in the same category." <u>State v. Ferguson</u>, 142 Wn.2d 631, 649, 15 P.3d 1271 (2001).

Here, as to the first <u>Ferguson</u> element, "[t]he aggravating factors cited by a court for imposing an exceptional sentence cannot be a "mere reference to the very facts which constituted the elements of the offense proven at trial." 142 Wn.2d at 648. For example, in <u>State v. Fletcher</u>, the defendant was convicted at a bench trial of two counts of vehicular assault, and the trial court imposed an exceptional sentence based on findings that the victims' injuries "substantially exceeded the level bodily harm necessary to satisfy the elements of the offense." 20 Wn. App. 2d 476, 480-82, 500 P.3d 222, 229 (2021). The <u>Fletcher</u> court explained that although vehicular assault required a "substantial bodily injury," this element was distinct from the aggravating factor because "substantial bodily harm" could be temporary, but the victims' injuries were permanent and thus exceeded the "level of bodily harm necessary to satisfy the statutory elements of the offense." <u>Id.</u> at 489-90.

As in <u>Fletcher</u>, here, the statutory element, the elevating circumstance, is distinct from the aggravating factor. To elevate the stalking charge to a felony, the legislature required that Rousso knew that Fox was currently or formerly an attorney and that Rousso stalked Fox "to retaliate against [Fox] for an act that [Fox] performed during the

*course of official duties*." RCW 9A.46.110(5)(b)(v)(A), (B) (emphasis added). The aggravating factor requires proof that the defendant "committed the crime against an officer of the court in retaliation of the officer's performance of his or her duty to the *criminal justice system*" and defines "officer of the court" to mean a person serving as a defense lawyer. RCW 9.94A.535(3)(x). As the sentencing court reasoned, "The legislature, in its wisdom, decided a lawyer by itself does not merit an aggravating factor. Rather, it is a lawyer in the criminal justice system that may merit an aggravating factor . . . . [T]here is some sense that a criminal lawyer is more at risk than a civil lawyer." [22]

As for the second Ferguson element, whether the aggravating factor is "sufficiently substantial and compelling to distinguish the charged offense from others in the same category," the sentencing court specifically concluded that the aggravating circumstances found by the jury "are a substantial and compelling reason justifying an exceptional sentence above the standard range on counts 1 and 2." The court also concluded the aggravating circumstances provided a substantial and compelling reason to depart from the presumption of concurrent sentences and to instead require that the sentences on counts 1 and 2 run consecutively, as authorized by RCW 9.94A.535. In its

---

[22] Rousso additionally argues that "[t]he officer of the court factor could not be used both as part of the count (to raise it to a felony) and to support an exceptional sentence." Specifically, he argues that because the jury was not asked to specify which elevating circumstance raised his crime to felony stalking, this ambiguity means "the punishment must merge and the facts or violation cannot support an exceptional sentence." In support, he cites to State v. Nordby, 106 Wn.2d 514, 518, 723 P.2d 1117 (1986). But Nordby merely stated in dicta that the reasons for imposing an exceptional sentence "must take into account factors other than those which are necessarily considered in computing the presumptive range for the offense." Id. at 518. Moreover, Nordby is inapposite because it concerned the trial court's imposition of an exceptional sentence for a vehicular assault where the defendant pled guilty and, accordingly, there were no aggravating factors found by any jury. See id. at 516. Rousso does not explain how Nordby applies to the facts in this case. Therefore, pursuant to RAP 10.3, we decline to consider any double jeopardy or merger argument as to the exceptional sentence.

findings, the court highlighted one excerpt from Rousso's book, noting that it contained threats to Fox, Nussbaum, and others:

> This virulent hatred is going to dog me until the day I die. There will be no forgiving and there will be no forgetting. Instead, my hatred of these Evil Assholes will ferment and distill for the rest of my days. The hatred that consumes me is now part of my DNA, like my brown hair and brown eyes. It fills the air like a hungry, dark humidity that never goes away. I hate hate.

The court found that Rousso remained a danger to Fox and Nussbaum "and others in the criminal justice system against whom he has expressed anger and abhorrence."

In reaching its conclusions of law, the sentencing court considered the purposes of the SRA. First, it considered RCW 9.94A.010(1)—proportionate punishment—noting that Rousso's "stalking and knife attack on Neil Fox constituted truly alarming premeditated and egregious attacks on a member of the bar," which justified an exceptional sentence considering the severity of his actions. Further, the court considered RCW 9.94A.010(2)—promoting respect for the law—explaining that Rousso's "actions and words in this case threatened a defense attorney and a witness," and that "[t]here can be no greater attack on the criminal justice system," thus justifying an exceptional sentence. The sentencing court also considered RCW 9.94A.010(4) and (7)—to protect the public and reduce reoffending—explaining that Rousso's "increasing level of animosity Mr. Rousso demonstrated in the years leading up to the attack demonstrate his present and future dangerousness to the victims," as justifying an exceptional sentence "to protect the victims and reduce the risk of Rousso reoffending."

As described by the sentencing court, the evidence of the aggravating factors was "sufficiently substantial and compelling to distinguish the charged offense from

32

others in the same category." Thus, considering the Ferguson elements, we hold that the exceptional sentence is justified as a matter of law.

Finally, as to the third prong of the Law analysis, even if the reasons are supported by the record and justify an exceptional sentence, a reviewing court may reverse an exceptional sentence if it is clearly excessive. Law, 154 Wn.2d at 93; RCW 9.94A.585(4). Rousso suggests that his sentence was clearly excessive because Fox's injuries were "minimal," but fails to support his claim with any argument or authority. We evaluate whether an exceptional sentence is clearly excessive under an abuse of discretion standard, meaning the sentencing court's decision to impose an exceptional sentence is "based on untenable grounds or untenable reasons." Fletcher, 20 Wn. App. 2d at 491.

In State v. Kolesnik, 146 Wn. App. 790, 192 P.3d 937 (2008), the court determined that an exceptional sentence based on a jury special verdict similar to that here was not excessive. There, the defendant was convicted of assault in the first degree with a deadly weapon enhancement, and the jury entered a special verdict finding that he knew his victim was a law enforcement officer engaged in his official duties at the time of the assault. Id. at 799-800. The court held that the trial court acted within its discretion in imposing an exceptional sentence where the defendant was armed with a deadly weapon and assaulted a police officer whose injuries were significant and permanent. Id. at 805-06.

Here, as in Kolesnik, the court had a tenable basis to impose the exceptional sentence of 202 months. The State sought an even greater exceptional sentence of 257 months, emphasizing the impact Rousso's actions had on the criminal justice system,

the duration and nature of Rousso's disdain for Fox, and Rousso's own violent ideations towards Fox. While the court did not impose the State's requested exceptional sentence, its findings of facts and conclusions of law contemplated the virulent language in Rousso's book, his increasing level of animosity, and lack of accountability and concluded that he posed a future risk of danger to the community and Fox and Nussbaum. Excerpts from Rousso's book read during trial demonstrated his animosity and potential dangerousness, including the following:

> My downfall began when one lawyer . . . named Neil Fox, stuck a knife into my back . . .

> The biggest curse of the Jacob Stone case is the bitter, burning, personal hatred that I have for the seven lawyers who make up The Bar Card Lynch Mob – Neil Fox, Lenell Nussbaum . . . .

> In my nightmares I have smashed Neil Fox's skull with a steel pipe, pi[ñ]ata style. In my nightmares I have sliced Neil Fox to shreds with a long hunting knife. And in my nightmares I have strangled Neil Fox with barbed wire. And those would be some of the more pleasant ways in which I have killed Neil Fox . . . .

> In my dreams I have done horrible things to Lenell Nussbaum's face with broken glass, battery acid and razor blades . . . .

> I am also quite certain that I could kill Neil Fox and get away with it . . . .

> Even now, years later, I cannot think about any member of The Bar Card Lynch Mob for more than a few seconds before my thoughts turn extremely violent.

Thus, although Fox's injuries were not as severe as they could have been, the sentencing court concluded that an exceptional sentence was necessary based on Rousso's targeted attack on Fox as an attorney in the criminal justice system and his continuing anger with the victims and others. We conclude that the trial court's decision to impose an exceptional sentence of 202 months was based on tenable grounds.

CONCLUSION

We affirm the judgment and sentence.

_Chung, J._

WE CONCUR:

_Birk, J._